IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **CHERYL HUFSTETLER,** ) | **CASE NO. 1:10CV1196** |
| ) | |
| Plaintiff, ) | |
| ) | **MAGISTRATE JUDGE GREG WHITE** |
| v. ) | |
| ) | |
| **COMMISSIONER OF SOCIAL** ) | |
| **SECURITY ADMINISTRATION,** ) | |
| ) | |
| Defendant. ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff, Cheryl Hufstetler ("Hufstetler"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Hufstetler's claim for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. This matter is before the Court pursuant to 42 U.S.C. § 405(g) and the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the final decision of the Commissioner is affirmed.

**I. Procedural History**

On June 15, 2005, Hufstetler filed an application for POD, DIB, and SSI alleging a disability onset date of January 1, 2003, and claiming that she was disabled due to diabetes mellitus. (Tr 675-678.) Her application was denied both initially and upon reconsideration. (Tr. 678-682.) Hufstetler timely requested an administrative hearing.[1]

---

[1]At the hearing, Hufstetler amended the alleged onset date of her disability to June 19, 2005. (Tr. 739.)

On March 19, 2008, an Administrative Law Judge ("ALJ") held a hearing during which Hufstetler, represented by counsel, testified. Thomas F. Dunleavy, an impartial vocational expert, also testified. On April 4, 2008, the ALJ found Hufstetler was able to perform a significant number of jobs in the national economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

## II. Evidence

### *Personal and Vocational Evidence*

Age 46 at the time of her administrative hearing, Hufstetler is a "younger" person under social security regulations. *See* 20 C.F.R. §§ 404.1563, 416.963. (Tr. 37.) Hufstetler has a high school education and past relevant work as a prep cook, hand packager, file clerk, and fast food worker. (Tr. 740, 742, 765.)

### *Medical Evidence*

In May, 2005, Hufstetler presented to Stephen Musser, D.P.M., with pain at the top of both feet. (Doc. No. 202.) Custom orthotics were prescribed. *Id*. At a follow-up visit in June, 2005, Hufstetler indicated that she was very happy with the orthotics. *Id.* Dr. Musser reported that Hufstetler should respond well to treatment. *Id*. He further indicated that there were no vascular or neurological findings relating to her diabetes. *Id*.

On June 27, 2005, Robert Klaus, M.D., at Fairview General Hospital performed a total abdominal hysterectomy on Hufstetler. (Tr. 181-183.) On July 5, 2005, she presented to the emergency room at St. John West Shore Hospital complaining of sharp abdominal pain, fever, nausea, vomiting and diarrhea. (Tr. 622-625.) Mild drainage was noted over the incision in her lower abdomen. (Tr. 624.) On July 17, 2005, she was admitted to the Cleveland Clinic Hospital for a pelvic seroma. (Tr. 434-494.)

On July 19, 2005, Hufstetler presented to Cheryl Katz, M.D., with a history of Type II diabetes mellitus, hypertension, hyperlipidemia, and anemia. (Tr. 204-206; 242-248.) Dr. Katz reported that her blood sugars were out of control and her blood pressure was elevated. (Tr. 204.) Dr. Katz further assessed normal gait and posture, back range of motion, and neurological

exam. (Tr. 242-248.)

On August 9, 2005, Hufstetler's main concern on a visit to Dr. Katz was the achiness in her legs. (Tr. 240.) The doctor assessed leg pain, together with Type II diabetes, and recommended quinine capsules. She also increased her glucophage to help control her diabetes. *Id*.

On August 31, 2005, Dr. Katz noted that Hufstetler reported significant improvement in her general condition. (Tr. 238.) Hufstetler, after running out of Duragesic and Percocet for a week, told the doctor she no longer needed those medications. *Id*. Dr. Katz noted that Hufstetler's complaints at this appointment included hot flashes and an abscess in her left arm pit. *Id*. She was prescribed Ultracet and Vicodin as "PRN"[2] medications for relief of her abdominal/pelvic/rectal pain. (Tr. 239.)

On September 6, 2005, Dr. Katz reported to the Bureau of Disability Determination that Hufstetler was recovering from a hysterectomy. (Tr. 205.) Dr. Katz further reported that because Hufstetler was dependent on narcotic analgesics, she was unable to work:

> At this point she is not controlled adequately enough to remove her from her narcotic analgesics which would make it difficult, if not impossible, for her to be placed in a gainful position of employment where she could be counted on to perform her duties or other coworkers could count on her to responsively perform her work duties. She is going to need at least an additional several months if not up to one year before she will be stabilized enough to adequately regain the work force.

(Tr. 205.) The record reflects that Hufstetler was a "no show" for her scheduled appointment with Dr. Katz on September 27, 2005. (Tr. 237.) The record further reflects that Hufstetler visited Dr. Katz eight times between November 14, 2005, and April 18, 2006. (Tr. 221-236.) At these visits, there was no further mention of Hufstetler's pain or problems arising from the hysterectomy. However, she did speak of continuing pain in her feet caused by arthritis and

---

[2]"PRN" is from a Latin phrase, *pro re nata*, meaning "according to circumstances." *Dorland's Illustrated Medical Dictionary* 1520 (30th ed. 2003).

3

peripheral neuropathy. *Id*. Dr. Katz prescribed Avinza[3] for her pain, and Vicodin when it became severe. (Tr. 224-234.) In March, 2006, because Hufstetler complained that her pain had spread to her shoulder, hands and knees (mainly on her left side), Dr. Katz referred her to a rheumatologist. (Tr. 222.)

Nazih M. Zein, M.D., a rheumatologist, examined Hufstetler on March 31, 2006, regarding complaints of severe pain and swelling in her left shoulder and chronic pain and a tingling sensation in her feet. (Tr. 212-217.) Dr. Zein assessed bursitis of the left shoulder and peripheral neuropathy of the feet. (Tr. 217.) At a follow-up visit on April 17, 2006, Dr. Zein recommended a physical therapy evaluation and treatment. (Tr. 211.) If that was not successful, he thought an injection for pain would be indicated. *Id*.

On April 18, 2006, Dr. Katz reviewed a magnetic resonance image ("MRI") of Hufstetler's left shoulder and diagnosed a focal tear of the rotator cuff.[4] (Tr. 251.) On July 19, 2006, Mark Berkowitz, M.D., performed an arthroscopy of the shoulder. (Tr. 499-500.)

In August, 2006, Hufstetler had an MRI of her lumbar spine due to "low back pain with history of falls." (Tr. 513.) It showed a L5-S1 disc bulge causing narrowing of the central canal and degenerative disc disease. *Id*. In October, 2006, Atef Eltomey, M.D., referred her to physical therapy for back pain. (Tr. 516-524.) She attended an initial evaluation, but was unable to attend any scheduled sessions due to her father being hospitalized. (Tr. 520-521.)

In November, 2006, due to Hufstetler's left knee pain, a vascular study was performed by Daniel McLaughlin, M.D., showing a normal resting lower extremity. (Tr. 526.)

In February, 2007, Hufstetler was examined by rheumatologist, Kimberly K. Thomsen, M.D., for bilateral lower extremity pain. (Tr. 552-555.) Hufstetler reported 10/10 pain from her knees to her toes. (Tr. 552.) Dr. Thomsen assessed diabetes and significant peripheral

---

[3]During this time period, the Avinza prescription began at 30 m.g., and by April 18, 2005, was increased to 90 m.g.

[4]The second page of Dr. Katz's April 18, 2006, progress note appears to be missing as there is no Assessment/Plan or any indication of the requested MRI.

neuropathy. (Tr. 553.) The doctor recommended that Hufstetler follow-up with neurology for better pain control, start taking calcium plus vitamin D, continue podiatric care and maintain use of good shoes with proper support. *Id*. On a follow-up exam in March, 2007, Hufstetler reported her pain to be 5/10. (Tr. 550.)

Hufstetler saw Dr. Thomsen again in June, 2007, and described her pain in her lower back and legs to be 10/10. (Tr. 542.) The doctor found positive straight leg raising, diminished reflexes and point tenderness in the lumbar spine. *Id*. An MRI of Hufstetler's lumbar spine revealed a "bulging annulus at L4/5 with right paracentral disc protrusion" which "abuts and may impinge upon the right L5 nerve root within the canal" and a "disc/osteophyte at L5/S1" which "abuts but does not displace the exiting right L5 nerve root." (Tr. 540.)

On January 29, 2008, Hufstetler presented to John H. Nickels, M.D., of the Cleveland Back and Pain Management Center for an evaluation. (Tr. 627-631.) Upon examination, Dr. Nickels noted that she had a slow gait, arose from a chair slowly, had decreased ranges of lumbar motion, was unable to duck walk, heel walk, toe walk, or squat, had absent knee and Achilles reflexes bilaterally and exhibited paravertebral spasms at the L2-S1 levels. (Tr. 628-630.) He diagnosed lumbar radiculopathy and diabetic peripheral neuropathy. (Tr. 631.) His notes indicated that Hufstetler should be treated at the Cleveland Clinic pain management center and that she needed a spinal cord stimulator. (Tr. 631.)

**Emergency Room Visits**

Between February 14, 2006, and December 23, 2007, Hufstetler made several visits to hospital emergency rooms, usually complaining of pain from peripheral neuropathy. At a February 14, 2006, visit to the Cleveland Clinic emergency room, Hufstetler complained of increased and worsening left foot and ankle pain with swelling. (Tr. 255-258.) She was assessed with neuropathic pain in feet and prescribed Percocet 5 m.g. (Tr. 256.) In April, 2006, she presented at Fairview Hospital emergency room complaining of left leg, feet and hand pain affecting her sleep. (Tr. 410-418.) She was diagnosed with exacerbation of chronic peripheral neuropathy and arthritis and prescribed Percocet 5 m.g. *Id*.

Following her left shoulder surgery to repair a torn rotator cuff, Hufstetler visited

5

Fairview Park's emergency room on July 31, 2006, complaining of sharp, shooting right elbow pain and of intermittent vomiting and diarrhea. (Tr. 506-509.) She was diagnosed with tendinitis, right elbow, and gastroenteritis. (Tr. 507.) On discharge, she was prescribed nonsteroidal anti-inflammatory drugs, pain medications, and antiemetics. (Tr. 508.)

On May 22, 2007, Hufstetler presented to Fairview Hospital's emergency room with right hip and pelvic pain after falling when her leg gave out. (Tr. 544-549, 574-582.) An x-ray of her right hip showed no acute bony process. (Tr. 547.) She was prescribed Percocet and Toradol. (Tr. 546.)

On August 20, 2007, Hufstetler went to Fairview Hospital's emergency room after becoming lightheaded and falling. (Tr. 530-535, 557-573.) An x-ray revealed "lateral malleolus and posterior malleolus fractures with small avulsion type fractures at the anterior tibiotalar joint and subluxation at the tibiotalar joint." (Tr. 564.) Because she preferred to be treated at the Cleveland Clinic, she signed herself out and was seen the next day at the Clinic's emergency room. (Tr. 648-672.) Orthopaedics was consulted and an open reduction with internal fixation was performed. (Tr. 653, 661.) It was noted that she had decreased sensation over the bottom of both feet. (Tr. 661.) Hufstetler was placed in a posterior splint and treated with Morphine and Dilaudid for pain. (Tr. 658.)

On November 20, 2007, Hufstetler was taken to St. John West Shore Hospital's emergency room due to hallucinations and changes in her mental status. (Tr. 608-615.) She believed she may have consumed an extra dose of Percocet, causing confusion. (Tr. 612.) The attending physician noted that she had baseline insomnia and anxiety, but she was not suicidal. *Id*.

On December 23, 2007, Hufstetler presented to St. John West Shore's emergency room with complaints of severe pain in her feet. (Tr. 604-607.) Upon examination, the doctor noted that Hufstetler appeared well, but found mild pain with tenderness in her feet. (Tr. 606.) She was diagnosed with chronic neuropathy and prescribed Dilaudid 1 m.g. for pain. (Tr. 605.)

On December 24, 2007, Hufstetler returned to the emergency room at St. John West Shore complaining that the pain had not improved. (Tr. 584-603.) The doctor noted that she

appeared to be in severe distress. (Tr. 588.) She was administered Dilaudid 2 m.g. (Tr. 587.)

**Medical Evidence Produced after the ALJ's Decision**

On May 19, 2008, Dr. Katz completed a Work Restriction Evaluation indicating that Hufstetler was able to sit less than two hours a day, walk and stand less than one-third of an hour a day, lift no more than ten pounds, and she was not able to bend, squat, climb, kneel, twist, use her hands for simple grasping or fine manipulation, push/pull, reach, or operate foot controls for repetitive movements. (Tr. 686.)

In June, 2008, Dr. Katz noted that Hufstetler suffered from severe pain related to inflammatory arthritis, lumbar disc disease, and diabetic peripheral neuropathy. (Tr. 711.)

In July, 2008, in an examination by Dr. Thomsen, Hufstetler complained of numbness, tingling, and sharp pain in her upper extremities. (Tr. 725.) The doctor diagnosed that peripheral neuropathy had spread to Hufstetler's hands. *Id*.

In January, 2009, Hufstetler was evaluated by Jonathan Miller, M.D., of University Hospital Neurological Institute. Examination revealed severely limited motor strength due to pain, markedly decreased sensation to light touch, vibration and pinprick, worse in the lower extremities, and a markedly antalgic gait. (Tr. 714.) Dr. Miller assessed severe diabetic neuropathy. (Tr. 715.) He noted that she was a good candidate for a trial of spinal cord stimulator. *Id*. After undergoing an implantation of a trial percutaneous lead with excellent results, Hufstetler received a surgical lead for control of her pain on February 17, 2009. (Tr. 719-732.)

In February, 2009, Dr. Katz completed a physical residual functional capacity assessment noting that Hufstetler could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk less than 2 hours in an 8-hour day with frequent breaks, sit for less than six hours in an 8-hour day, push/pull up to 15 pounds with her upper and lower extremities, but she could not climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger and feel. (Tr. 687-694.)

In April, 2009, Dr. Miller reported that Hufstetler is doing well after her stimulator implantation. (Tr. 713.)

*Hearing Testimony*

At the hearing, Hufstetler testified to the following:

- She lives with her nine-year old son. (Tr. 737-738.)

- Her step-daughter comes to her house to help get her son ready for school and help her get dressed. Her step-daughter also does the housework, laundry, and shopping. (Tr. 738, 749-751.)

- She had difficulty sitting, standing and walking even before she stopped working in June, 2005. (Tr. 745-746.)

- She has used a walker since 2002. *Id*.

- Sometimes she loses feeling in her feet when she is walking. (Tr. 760.) When she broke her ankle in August, 2007, her leg gave way without warning, causing her to fall. (Tr. 762.)

- Due to arthritis in her hands and fingers, she no longer sews, crochets, or knits. (Tr. 752.) Sometimes she has difficulty signing her son's school planner. *Id*.

- Due to the neuropathy in her hands, she is unable to grip things and, therefore, is unable to hold on to items. (Tr. 748.)

- She can lift five pounds, stand no more than 15 minutes, and sit no more than 20 minutes. (Tr. 746-747.)

The ALJ posed the following hypothetical to the VE:

Assume an individual situated as the claimant's age, education and work experience who was capable of light work. Should never climb ladders, rope or scaffolding. Should avoid concentrated exposure to work hazards. Any job such an individual can perform, that would include past relevant work?

(Tr. 765.)

The VE testified that there would be some past relevant work as a file clerk and a fast food worker. *Id*. The ALJ asked the VE to consider what jobs would be available if such person needed a walker to ambulate. *Id*. The VE testified that most jobs would be precluded, except for a cashier position. (Tr. 765-766.) The VE indicated that even taking a conservative approach there would be at least 10,000 unskilled cashier positions in the State of Ohio. (Tr. 766.) The ALJ next asked the VE to consider if such person had to elevate one leg about eighteen inches. *Id*. The VE testified that there would be no light level work available. *Id*.

The ALJ next asked the VE to consider such an individual who is capable of sedentary work. *Id*. The VE testified that no past relevant work would be available, but such a person

8

could perform jobs such as assembler, visual inspector, and an assortment of cashiers. (Tr. 766-767.) The VE further testified that even if such an individual needed a walker for ambulation, cashier positions would still be available. *Id*. However, there would be no jobs if the individual needed to elevate one leg eighteen inches, if the person missed work four days a month, or if the individual had only occasional use of his/her hands. (Tr. 767-768.).

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[5]

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Hufstetler was insured on her alleged disability onset date, June 19, 2005, and remained insured through the date of the ALJ's decision, April 4, 2008. (Tr. 28, 38.) Therefore, in order to be entitled to POD and DIB, Hufstetler must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen,* 861 F.2d 991, 994 (6th Cir. 1988);

---

[5]The entire process entails a five-step analysis as follows: First, the claimant must not be engaged in "substantial gainful activity." Second, the claimant must suffer from a "severe impairment." A "severe impairment" is one which "significantly limits ... physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets a required listing under 20 C.F.R. § 404, Subpt. P, App. 1, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d) and 416.920(d)(2000). Fourth, if the claimant's impairment does not prevent the performance of past relevant work, the claimant is not disabled. For the fifth and final step, even though the claimant's impairment does prevent performance of past relevant work, if other work exists in the national economy that can be performed, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

*Henry v. Gardner*, 381 F. 2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

### IV. Summary of Commissioner's Decision

The ALJ found Hufstetler established medically determinable, severe impairments, due to diabetes mellitus with peripheral neuropathy in her legs, a bulging annulus at L4-5 with a disc protrusion abutting the right L5 nerve root, and osteoarthritis of the right knee; however, her impairments, either singularly or in combination, did not meet or equal one listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Hufstetler was found incapable of performing her past work activities, but was determined to have a Residual Functional Capacity ("RFC") for the full range of sedentary work. The ALJ then used the Medical Vocational Guidelines ("the grid") as a framework and VE testimony to determine that Hufstetler is not disabled.

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v.*

10

*Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards, as promulgated by the regulations, or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Hufstetler claims the ALJ erred by (1) improperly assessing her severe impairments at step three of the sequential evaluation, and (2) improperly calculating the RFC determination. Hufstetler further contends that remand is necessary in order for the ALJ to consider new and material evidence. The Commissioner argues that the ALJ's decision is supported by substantial evidence and that a remand is not necessary.

**Listing Analysis**

Hufstetler argues that the ALJ erred by considering only Listings 1.03 and 1.04 regarding musculoskeletal conditions and not Listings relating to peripheral neuropathy (Listings 9.08 and 11.14.) (Doc. No. 16 at 17-19.) She contends that the ALJ erred by not considering whether her diabetes mellitus and neuropathy met or equaled a Listing. She claims the record is replete with evidence that her "severe diabetic peripheral neuropathy caused her pain, restricted motion, decreased sensation, numbness, swelling, tingling and instability in her upper and lower extremities." (Doc. No. 16 at 18.) The Commissioner argues that Hufstetler fails to meet her

11

burden of proof at step three. (Doc. No. 20 at 6-7.)

A claimant's impairment must meet every element of a Listing before the Commissioner may conclude that she is disabled at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1520; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986). The regulations provide that in making a medical equivalence determination, the Social Security Administration will "consider the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. § 404.1526(c). Nevertheless, "[t]he burden of providing a ... record ... complete and detailed enough to enable the Secretary to make a disability determination rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986); *King v. Sec' of Health & Human Servs.*, 742 F.2d 968, 974 (6th Cir. 1984). It is not sufficient to almost establish the conditions of a Listing. *See, e.g.*, *Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir. 1989) (ALJ's decision affirmed where medical evidence "almost establishes a disability" under Listing).

Section 9.08 of Appendix 1 provides the disability listing requirements for diabetes mellitus. Specifically, Section 9.08A applies to diabetes that presents with "[n]europathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C) ...." 20 C.F.R. Pt. 404, Subpt P, App. 1, § 9.08. Section 11.00C provides as follows:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.00C.

A claimant meets the Section 11.14 Listing, peripheral neuropathies, if she establishes that the impairment causes "disorganization of motor function as described in 11.04B, in spite of prescribed treatment." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 11.14. Section 11.04B Listing requires "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see

12

11.00C)." 20 C.F.R. pt. 404, subpt. P, App. 1 § 11.04B.

The ALJ concluded that Hufstetler did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments, explaining as follows:

> In making this finding I have considered sections 1.03 and 1.04 of the musculoskeletal listings, which refer to surgery to a major weight bearing joint and disorders of the spine respectively. There is no evidence that she has been unable to ambulate effectively for a period of 12 continuous months at any time relevant to this decision; I have particularly noted the period since her August 20, 2007 left ankle fracture. Despite the claimant's claims of needing to use a walker since 2002, it is noted that Dr. Katz, the claimant's treating physician, observed that the claimant's gait was normal, an examination of her major joints revealed a normal range of motion throughout with no pain or contracture, and strength and reflexes were normal in July, 2005 (Exhibit 6 F, page 39.)

(Tr. 32.)

Although it is undisputed that Hufstetler has diabetic neuropathy, the record indicates that, during the relevant time period, there was no significant or persistent disorganization of motor function. In July, 2005, Dr. Musser noted there were no vascular or neurological findings relating to her diabetes. (Tr. 202.) The same month, Dr. Katz assessed normal gait and posture, back range of motion, and neurological exam. (Tr. 242-248.) In November, 2005, a left foot x-ray showed no bony or joint abnormality. (Tr. 293.) In December, 2005, Dr. Katz noted no back pain, knee pain, or feet numbness/tingling, but she did note the following regarding Hufstetler's left foot:

> [P]inpoint scar in the area between the base of the first & second metatarsals (site of previous wound) with no signs of residual infection/inflammation. Minimal tenderness on palpation of this area. Extreme tenderness on palpation over the dorsum of the foot in the area of the cuneiform she has won [sic] with radiation of the pain up into the ankle & anterior shin. Full range of motion of the joints.

(Tr. 233.) In February, 2006, Dr. Katz noted "mild tenderness on palpation bilaterally, slightly worse on the dorsum of the left foot + parasthesias [and] full range of motion of all joints." (Tr. 227.) When Hufstetler presented to the emergency room with leg and hand pain in April, 2006, she stated that she would like pain medications and then would be on her way. (Tr. 412.) A November, 2006, vascular study showed a normal resting lower extremity. (Tr. 526.) When Hufstetler visited the emergency room in November, 2007, claiming that she became confused after possibly taking an extra dose of Percocet, the doctor noted upon examination that she had

13

full range of movement with her upper and lower extremities and she exhibited no focal neurological deficits. (Tr. 612.) Moreover, Hufstetler indicated in her Function Report completed on June 30, 2005, that she did a host of activities, including walking, using public transportation, taking her child to games, cooking, shopping, doing laundry, and cleaning. (Tr. 100-107.)

"Sixth Circuit case law does not require a heightened articulation standard at step three of the sequential evaluation process." *See Marok v. Astrue*, 2010 WL 2294056, *3 (N.D. Ohio, Jun.3, 2010) (*quoting Bledsoe v. Barnhart*, No. 04-4531, 2006 WL 229795, at *411 (6th Cir. Jan.31, 2006)) (*citing Dorton v. Heckler*, 789 F.2d 363, 367 (6th Cir.1986)). The regulations state that the ALJ should review all evidence of impairments to see if the sum of impairments is medically equivalent to a "listed impairment." 20 C.F.R. §§ 404.1526, 416.926. In order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for her decision. *Marok* at *3.

The ALJ did not specifically refer to Hufstetler's neuropathy or to Listings 9.08 and 11.14 in her step three analysis. Nonetheless, the Court finds that such mistake was harmless. Federal courts apply harmless error analysis cautiously in the administrative review setting. However, it has been used "to supply a missing dispositive finding ... where, based on material the ALJ did at least consider (just not properly), we could confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way." *Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004). In *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733 (10th Cir. 2005), the court concluded that the ALJ's failure to provide more than summary conclusion at step three was harmless error as the ALJ's findings at other steps of the sequential process provided a proper basis for upholding the step three conclusion. *See also Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 689 (8th Cir. 2005) ("Harmless error analysis may be appropriate to supply a missing dispositive finding in a social security disability proceeding, where, based on material the ALJ considered, the court can confidently say that no reasonable administrative factfinder, following the correct analysis, could have resolved the factual matter in any other way.")

Here, even though the ALJ did not specifically cite Hufstetler's neuropathy when addressing the Listings, she did so when analyzing the RFC.  The ALJ found Hufstetler lacking in credibility as to the severity of the neuropathy, but, nonetheless, limited her to sedentary work as an accommodation as follows:

> Regarding her waxing and waning foot pain, several different diagnoses were proposed and then discarded, and ultimately her pain was attributed to peripheral neuropathy, which has been treated with various medications (Exhibits 4F; 6F; 7F; 8F; 11F, page 4; 12F; 14F).  As noted earlier in this decision, the claimant experienced ambulation problems following an ankle fracture, but her lower extremity peripheral neuropathy and knee osteoarthritis continue to be underlying problems which impact her ability to walk and stand.  I have accommodated this limitation by restricting her to sedentary work.
>
> * * *
>
> Even when she complained of severe foot pain in the spring of 2006 the claimant was able to ambulate to the treatment room with a good steady gait (Exhibit 10F).  Moreover, I have particularly noted the January 21, 2007 emergency room records, when she was diagnosed with gastroenteritis, which reported no extremity pain or ambulation problems (Exhibit 11F).

(Tr. 34-35.)  This same analysis would be sufficient for a finding that Hufstetler did not meet or equal Listing 9.08A or 11.14.  Accordingly, if the ALJ's lack of discussion of Hufstetler's neuropathy at step three is error, it is harmless, as the ALJ's findings at step four provided sufficient consideration and the Court is confident that no reasonable administrative factfinder would have resolved the matter differently.

Hufstetler also contends that the ALJ was required to consult a medical expert regarding whether a listing was equaled.  (Doc. No. 16 at 18.)  "[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant him the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."  *Landsaw*, 803 F.3d at 214.  The ALJ has the "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary."  *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (citing 20 C.F.R. § 416.917) ("If your medical sources cannot or will not give us sufficient evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.")  Additionally, the regulations give an ALJ discretion to determine whether to consult a medical expert.  20

15

C.F.R. § 416.927(f)(2)(iii) (ALJ "may ... ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment.")  "The primary function of a medical expert is to explain medical terms and the findings in medical reports in more complex cases in terms that the [ALJ], who is not a medical professional, may understand." *Fullen v. Comm'r of Soc. Sec.*, 2010 WL 2789581, *12 (S.D. Ohio Apr. 20, 2010) (*citing Richardson v. Perales*, 402 U.S. 389, 408, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1972)).  The failure to order additional testing is, therefore, examined using an abuse of discretion standard.  *Foster*, 279 F.3d at 355.

Here, during the relevant time period there were no reports that Hufstetler was disabled due to peripheral neuropathy.  Dr. Katz opined that Hufstetler was disabled following the hysterectomy, but it was not until November 14, 2005, that she complained of severe lower extremity pain.[6]  (Tr. 235-236.)  The ALJ reasonably determined that the evidence of record did not support consideration of additional listings and Hufstetler failed to meet her burden to establish otherwise.  Furthermore, the Court notes that no physician has ever opined that Hufstetler demonstrates "significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements, or gait and station."  *See* Listing 9.08 and 11.04B.

**RFC Determination and Opinions of Treating Physicians**

Hufstetler contends the RFC determination that she was capable of performing sedentary work was improper as the ALJ accorded little weight to the opinions of treating physicians, Drs. Katz and Nickels.  (Doc. No. 16 at 19-22.)  The Commissioner maintains that substantial evidence supports the RFC determination.  (Doc. No. 29 at 8-10.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence

---

[6]On August 9, 2005, Hufstetler complained of achiness in her legs, for which Dr. Katz prescribed quinine capsules.  (Tr. 240.)  At the next visit with Dr. Katz on August 31, 2005, Hufstetler reported a significant improvement in her general condition and did not complain of lower extremity pain.  (Tr. 238, 239.)

16

in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 Fed. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore, "[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[7]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject such determinations when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir.1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that

---

[7] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The ALJ found that Hufstetler was not entirely credible as she was not convinced that Hufstetler's "intense episodes of pain have been so frequent or long lasting that they have precluded all work at all exertional levels." (Tr. 36.) The ALJ reviewed the treating physician's opinion and properly did not give it controlling weight:

> As for the opinion evidence, I have considered Dr. Katz's September 13, 2005, opinion at Exhibit 5F, page 3), in which she indicates that the claimant would be incapable of working for several months, or up to a year, because of the complications and pain resulting from her June 27, 2005 hysterectomy. This opinion was rendered only two months after the claimant first consulted Dr. Katz for acute complications related to her hysterectomy, which was two and one half years ago, and there is nothing recent in the record to suggest that her symptoms persisted and are presently disabling. In fact, as noted earlier in this decision, on August 31, 2005, Dr. Katz herself reported that the claimant's general condition had improved, and her pain level had plummeted from a ten on a one to ten scale to a five on the one to ten scale; and the claimant did not need potent pain medications any longer (Exhibit 6F). There is nothing in the record including Dr. Katz's treatment notes showing the complications and resulting limitations related to the hysterectomy lasted twelve continuous months, thus, Dr. Katz's opinion is not given controlling weight in terms of the claimant fulfilling the durational requirement for the purposes of disability under the Social Security Act and Regulations.

(Tr. 36.) As to Dr. Nickels' opinion, the ALJ found he was not a treating source as Hufstetler saw him only one time. *Id*. Furthermore, his notes indicate that he relied upon Hufstetler's own subjective complaints rather than objective criteria and, therefore, the ALJ gave his opinion "not more than minimal weight." *Id*.

Therefore, there is substantial evidence in the record to support the RFC determination.

**Alleged New, Material Evidence Presented to the Appeals Council**

Evidence first submitted to the Appeals Council, may be considered only to determine whether the case should be remanded under section six of 42 U.S.C. § 405(g). *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 149 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Washington-Wheeler v. Comm'r of Soc. Sec.*, 2010 WL 376329, *1 (fn. 2) (E.D. Mich. Jan. 26,

2010). Not until one month after the ALJ's decision did Dr. Katz opine that Hufstetler could lift between zero and ten pounds and sit for two hours per day. (Tr. 686.) Ten months after the decision, Dr. Katz opined that Hufstetler could: (a) lift no more than 10 pounds occasionally and less than 10 pounds frequently; (b) stand/walk for less than two hours per day with frequent breaks; (c) sit for less than six hours per workday alternating between sitting and standing periodically; (d) push/pull on a limited basis with upper and lower extremities; and, (e) never climb, balance, stoop, kneel, crouch, or crawl. (Tr. 687-694.) Hufstetler also relies on the 2009 implantation of a spinal cord stimulator to control her pain. (Doc. No. 16 at 23-24.)

Evidence is "material" for purposes of sentence six remand if it is time-relevant, *i.e.*, either relates to the period on or before the date the ALJ rendered his decision. *See, e.g., Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 478 (6th Cir. 2003). Also, evidence is "material" only if there is a reasonable probability that the ALJ would have reached a different conclusion if the evidence had been considered. *Foster*, 279 F.3d at 358. Here, the new evidence does not relate to the relevant time period before the denial of benefits and, therefore, it is not material. Furthermore, Hufstetler failed to establish that the ALJ's consideration of this new evidence would have altered his conclusion as some of the evidence may also support lesser restrictions than contained in the RFC. For example, Dr. Miller, the neurosurgeon, noted that after the implantation of the spinal cord stimulator, Hufstetler's leg pain was much improved. (Tr. 713.) Here, the evidence fails to meet the criteria for a sentence six remand. A remedy remains, however, as Hufstetler may initiate a new claim for benefits if her condition has indeed changed. *See Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

## VII. Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence. Accordingly, the decision of the Commissioner is affirmed and judgment is entered in favor of the defendant.

IT IS SO ORDERED.

                                                s/ Greg White
                                                United States Magistrate Judge

Date: June 17, 2011